# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# COOKEVILLE DIVISION

| | |
|---|---|
| JOSEPH WOLCOTT, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | NO. 2:13-cv-00062 |
| ) | CHIEF JUDGE CRENSHAW |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION

Before the Court is Joseph Wolcott's Motion to Vacate his sentence in Case Number 2:08-cr-13-1 (the "Petition"). (Doc. No. 1.) On September 12, 2017, the Court held an evidentiary hearing on Claim Three in the Petition. For the following reasons, the Petition is denied.

I. PROCEDURAL HISTORY

On December 3, 2008, a Grand Jury indicted Wolcott on (1) conspiracy to distribute and to possess with intent to distribute marijuana; (2) traveling in interstate commerce to distribute the proceeds of an unlawful activity; (3) use of wire communications to facilitate illegal gambling; and (4) conducting an illegal gambling business. United States v. Wolcott, No. 2:08-cr-13, Doc. No. 3. The Magistrate Judge appointed the Public Defender to represent Wolcott. Id. at Doc. No. 30 (Dec. 5, 2008). On January 22, 2009, appointed counsel filed a Motion to Substitute Attorney for Wolcott, indicating that Wolcott had retained attorney Patrick T. McNally, id. at Doc. No. 161 (Jan. 22, 2009), which the Honorable Todd J. Campbell granted, id. at Doc. No. 162 (Jan. 23, 2009).

On February 4, 2009, the Grand Jury returned a Superseding Indictment against Wolcott. Id. at Doc. No. 186. In it, Count 1 differed from the original Indictment by charging conspiracy to

distribute and to possess with intent to distribute 1,000 kilograms or more of marijuana. Id. The superseding indictment also added two charges for conspiracy to commit money laundering. Id. On July 1, 2009, Wolcott was temporarily detained, and subsequently the Honorable William J. Haynes ordered that Wolcott be detained pending trial. Id. at Doc. Nos. 350, 377.

On August 25, 2009, Peter Strianse entered an appearance on behalf of Wolcott. Id. at Doc. No. 405. On March 15, 2010, Strianse moved for Judge Haynes to reconsider his decision to detain Wolcott pending trial. Id. at Doc. No. 590. In support, Strianse notified the court about Wolcott's medical problems, including his "profound memory loss." Id. at 3. Judge Haynes denied the motion and Wolcott remained detained. Id. at Doc. No. 628.

On March 31, 2010, the Grand Jury returned a second superseding indictment against Wolcott. Id. at Doc. No. 598. This indictment added the charge that Wolcott sponsored and exhibited an animal in an animal fighting venture. Id. On January 14, 2011, the Government filed an Information, pursuant to 21 U.S.C. § 851 (an "851 Information"), to establish that Wolcott had a prior felony drug conviction, raising Wolcott's mandatory minimum sentence on Count 1 to twenty years of imprisonment, if convicted. Id. at Doc. No. 680.

On January 25, 2011, Wolcott went to trial on the Second Superseding Indictment. Id. at Doc. No. 697. On February 4, the jury found Wolcott guilty of (1) conspiracy to distribute and to possess with intent to distribute 1,000 kilograms or more of marijuana; (2) traveling in interstate commerce to distribute the proceeds of an unlawful activity involving gambling; (3) conducting an illegal gambling business; (4) conspiracy to commit money laundering; and (5) sponsoring and exhibiting an animal in an animal fighting venture. Id. at Doc. No. 712. Judge Haynes sentenced Wolcott to serve a total of 276 months of imprisonment followed by ten years of supervised

release. Id. at Doc. No. 814 (June 8, 2011). The United States Court of Appeals for the Sixth Circuit affirmed the judgment. Id. at Doc. No. 955 (June 8, 2012).

II. ANALYSIS

Wolcott moves to vacate his sentence on four grounds: (1) the district court, rather than the jury, determined the fact of his prior conviction to enhance his mandatory minimum sentence; (2) the district court did not use the correct approach, nor did trial counsel ask the court to do so, in enhancing the mandatory minimum penalty based upon a disputed prior conviction; (3) ineffective assistance of trial counsel in plea negotiations; and (4) ineffective assistance of trial counsel for preventing Wolcott from testifying and appellate counsel for failing to raise the issue on appeal. (Doc. No. 2.) Judge Haynes granted an evidentiary hearing on the third claim (Doc. No. 23), and Wolcott subsequently clarified his third claim (Doc. No. 45) pursuant to the Court's Order (Doc. No. 41).

A. THIRD CLAIM

Wolcott alleges that his trial counsel was ineffective during the plea negotiation process because he failed to correctly advise Wolcott on the effect of an 851 Information and he failed to recognize the impact of Wolcott's physical and mental impairments on his ability to comprehend plea offers. (Doc. No. 45 at 5.)

*1. Facts*

Peter Strianse served as Wolcott's sole counsel for his trial with Patrick McNalley as his co-counsel for much of the preparation. Strianse's good friend and colleague Kim Hodde represented Wolcott's son and codefendant, Kevin, and Jodie Bell represented Wolcott's then-wife and codefendant Rachel. (Doc. No. 64 at 10, 122.) Alex Little served as lead counsel for the United States.

Strianse has been practicing law for thirty-seven years and as a defense attorney for over twenty. (Id. at 37.) He is a former organized crime drug enforcement task force federal prosecutor. (Id. at 21.) Strianse visited Wolcott sixty-eight times over the twenty-one-month period prior to trial. (Id. at 16.)

Because one of Wolcott's codefendants was Kevin, the relationship between Hodde and Strianse was a little different than the typical relationship between counsels for co-defendants. (Id. at 115-16.) As a result of this, Hodde allowed Kevin to talk with Strianse about his representation of Wolcott without going through Hodde. (Id. at 115.) Hodde believed Kevin would have done anything to help his dad, including taking a larger sentence. (Id.)

    a. <u>Plea Negotiations</u>

In March of 2010, Strianse began discussing with Wolcott his criminal history, including a "healthy discussion" about "the effects of the filing of an 851 enhancement notice." (Id. at 21.) Strianse told Wolcott that if the Government filed an 851 Information, his mandatory minimum sentence would double from 10 years to 20.[1] (Id. at 40.) During the discussions, Wolcott was "very concerned" about the possibility of forfeiting all of his real and personal property, including a large number of motor vehicles. (Id.)

On July 12, 2010, McNalley sent a letter to Strianse indicating that the Government offered to "cap" the maximum sentence Wolcott could receive at ten years in exchange for him pleading guilty, and contingent on Kevin and Rachel Wolcott pleading guilty (a "package deal"). (Id. at 20; Pl.'s Ex. 7.) Strianse countered with a sixty month sentence, which was rejected, but asked him to return with a number between five and ten years. (Doc. No. 64 at 54.) On July 23, at a meeting in

---

[1] Hodde credibly testified that she would be "utterly surprised" if Strianse did not have a conversation about the effect of the Government filing an 851 Information with Wolcott. (Doc. No. 64 at 136.)

4

the Criminal Justice Center, Strianse proposed that Wolcott counteroffer to the Government with an eight year sentence, which Wolcott refused. (Id.)

Kevin wanted to take the package deal, but Wolcott did not support Kevin's decision and did not want to plead guilty at this stage. (Id. at 123.) On August 25, Hodde, Strianse, and Wolcott had a meeting at the Criminal Justice Center to discuss why the settlement option was best for Kevin. (Id. at 124-25.) Hodde presented Wolcott with a chart containing Kevin's options if he went to trial as compared with what sentence Kevin would likely receive if he took the plea deal. (Id. at 125.) Hodde felt like Wolcott did not comprehend the "very simple analysis" that showed it was best for Kevin to settle his case. (Id. at 126-27.) She tried multiple approaches, including discussing with Wolcott as if he was a seventh grader and using analogies with him, but all were unsuccessful. (Id. at 138.) After the meeting, Hodde called Kevin and told him that they had to sever their plea deal from Wolcott's, and the next morning she called the Government and "begged to be untethered" from Wolcott. (Id. at 129.)

On November 12, 2010, Strianse went to the Criminal Justice Center and discussed with Wolcott that at least six people were cooperating with the government and could testify against him at trial. (Id. at 24.) Wolcott did not believe that any of the cooperators would testify against him, even though Strianse showed him that they entered into cooperation plea agreements. (Id. at 51.) All six testified at trial. (Id. at 24.) At the end of the meeting, Wolcott authorized Strianse to offer a binding plea agreement in which Wolcott would serve six years and the Government would return all of Wolcott's property. (Id. at 57.)

By December 2, Strianse believed that the Government would settle the case in exchange for an agreement to serve seven-and-a-half years of incarceration and forfeit all of the property identified in the Indictment. (Id. at 24-25.) Even at that point, Wolcott hoped for a much better

5

deal. (Id. at 40.) When Strianse wanted to make a counteroffer of six years, Wolcott left him a voicemail instructing him not to make that offer. (Id.) Strianse believed that prior to the start of the trial, Wolcott only would have accepted an offer that included around 60 months of incarceration and the return of all of his property. (Id. at 50.)

On January 22, 2011, Strianse wrote an email to Little that stated that Wolcott would not cooperate with the Government in exchange for a better plea deal, but he would be willing to plead guilty to all counts of the second superseding indictment if the 851 Information was dropped and count one was amended to allege 100 kilograms or more of marijuana. (Id. at 28; Pl.'s Ex. 9.) The Government rejected that offer. (Pl.'s Ex. 9.)

Ultimately, Wolcott believed that if he waited until the jury started assembling on the morning of trial, the Government would offer a better deal than what Little was offering prior to that time. (Doc. No. 64 at 48.) Strianse advised Wolcott that given the number of witnesses that will testify for the Government and all the work Little will have to do in order to try the case, Wolcott should not count on the best offer being on the morning of trial. (Id.; id. at 53.) But Wolcott, relying on his state court experience from twenty years prior, believed that waiting was the best strategy. (Id. at 48-49.) Wolcott also believed that none of his coconspirators would testify against him at trial because they were all friends. (Id. at 51.) McNalley even had Wolcott appear at one of the codefendant's sentencing hearings to see that he was expected to cooperate at Wolcott's trial. (Doc. No. 65 at 54.) Strianse believed that ultimately Wolcott was going to get what he wanted or go to trial. (Id. at 53.) Little's final offer was for Wolcott to serve eight years, which Wolcott rejected. (Id. at 67.)

b. <u>Wolcott's Memory Problems</u>

In 2009, Wolcott suffered from headaches, dizziness, and memory loss. (Doc. No. 60-3 at 16.) His physician, Stacey B. Carlton, M.D., prescribed him Cerefolin for his memory loss problems. (<u>Id.</u>) On January 20, 2009, Wolcott reported to Dr. Carlton that the Cerefolin improved his memory issues, and he reported the same in February. (<u>Id.</u> at 27.) By May he was having marital problems and knew he was about to be incarcerated, and the stress from both those exasperated his memory loss issues. (<u>Id.</u> at 28.) Dr. Carlton opined that if Wolcott did not receive Cerefolin, his memory would deteriorate at an accelerated pace, although his memory would deteriorate even if he received the medication. (<u>Id.</u> at 33-34, 54.) Lyn McRainey, Ph.D., also reviewed Wolcott's medical records and testified that Cerefolin was not administered while Wolcott was incarcerated. (Doc. No. 60-2 at 6.) She opined that Wolcott had "extreme deficiencies in both immediate memory and delayed memory" based on tests performed in 2007 and 2015.[2] (<u>Id.</u> at 7.)

Wolcott was also taking multiple other medications for his blood pressure and sugar. (Doc. No. 60-4 at 29.) When he did not take those medications, he "did terribly," affecting his "energy, his functioning . . . everything." (<u>Id.</u> at 30.) Dr. Carlton opined that the better he could control his blood pressure and sugar, the less impact those have on his memory and cognition. (<u>Id.</u>) Dr. Carlton last saw Wolcott in June of 2009. (<u>Id.</u> at 42.) At no time did Dr. Carlton believe that Wolcott could not understand her, and Wolcott in fact did what Dr. Carlton told him to do. (<u>Id.</u> at 51.)

In November 2009, Kevin gave Hodde some of Wolcott's medical records and expressed concerns for Wolcott's overall health while incarcerated. (Doc. No. 68 at 117.) (Pl.'s Ex. 6), Hodde passed them along to Strianse. (Doc. No. 68 at 118.) She then discussed the medical records with

---

[2] Given the large period of time between the dates the tests were administered and the plea negotiations, these tests have very little weight in the Court's determination. That said, these tests are largely not material to this case because it is undisputed that Wolcott had memory loss issues.

Strianse via an email exchange. (Id. at 119.) These records referred to Wolcott's memory loss issues. (Ex. 6 at 3-5.)

In January 2010, McNally gave to Strianse some of Wolcott's medical records that indicated he had memory problems. (Doc. No. 68 at 11-13.) While Strianse was aware that the report indicated that Wolcott had memory problems, the only time during the course of his representation of Wolcott where Strianse noticed any memory problems was when the jail failed to give Wolcott his blood sugar medication. (Id. at 14.) Strianse did not believe that Wolcott had any memory difficulties that were a "constant source" of "any sort of confusion or problem for him." (Doc. No. 64 at 34.) He and Hodde had "numerous discussions about [Wolcott's] ongoing mental issues, both physical health, as well as this deteriorating memory issue that was going on." (Doc. No. 64 at 133.) During his sixty-eight visits with Wolcott at the jail, Strianse has detailed notes from substantive discussions about each potential witness that the Government could call. (Id. at 35.)

During the preparation of the presentence report, Strianse also made sure the Probation Officer included a complete history of Wolcott's health problems because when his blood sugar level dropped or his heart bothered him, he did not function at the same level as on other days. (Id. at 36.) The Presentence Report also indicates that Strianse "noted that the defendant experiences significant memory loss and has advised the U.S. Probation Office of this." (Id.; Pl.'s Ex. 12-1.) However, at no time during his representation did Strianse or McNalley believe that Wolcott needed to be evaluated by a psychiatrist. (Doc. No. 64 at 45; Doc. No. 65 at 56.) Rather, Strianse said that Wolcott had "excellent" engagement in his own defense. (Doc. No. 64 at 46.) Wolcott explained to Strianse his understanding of the case, understanding of who the witnesses were that

would testify against him, and gave Strianse cross examination material to use against those witnesses. (Id.)

    c.  Expert Testimony

Hugh Mundy was certified as an expert in the ethical duties of trial attorneys. (Doc. No. 64 at 74.) He opined that Strianse was "professionally and ethically duty-bound to procure a psychiatric evaluation during the pendency of settlement negotiations due to Mr. Wolcott's failing memory, dire physical condition, and unstable mental and emotional health." (Doc. No. 60-1 at 1.) Mundy cited the American Bar Association Model Rule of Processional Conduct 1.1, 1.3, and 1.14, in stating that lawyers need their clients to adequately prepare the factual elements of the case, and if a client has mental health issues, the attorney must "'identify the client's options more openly' and provide 'more guidance in reaching a decision.'" (Id. at 2-3.) Mundy opined that defense attorneys should use "collaborative decision-making," where the attorney provides support, structure, and guidance to the client's decisions, rather than ceding complete decision-making control to the client. (Id. at 2.) Mundy testified that the failure to "procure a psychiatric evaluation to measure Mr. Wolcott's ability to understand, appreciate, and remember case-critical information [ ] fell well below prevailing ethical and professional standards." (Id. at 5.)

2. *Analysis*

While Wolcott's Supplemental Brief goes into detail about his cognitive issues, which are undisputed, it is not until its last sentence where he explains what he believes Strianse should have done: counsel should have explained simply, repeatedly, and with concrete visual aids, the implications of the Sentencing Guidelines, mandatory minimums, and the 851 Information. (Doc. No. 69 at 28 ("With [information on Wolcott's mental deficiencies], he would have understood the need to explain –simply, repeatedly, and with concrete visual aids—the implications of the

Sentencing Guidelines, mandatory minimums, and the 851 notice.")) Wolcott also devotes two paragraphs, devoid of facts from the hearing, to attempt to show that he was prejudiced by counsel's deficiency. (Doc. No. 69 at 29.) The record, however, shows that Strianse was not deficient, and Wolcott was not prejudiced by any of Strianse's actions.

To prove that trial counsel was constitutionally ineffective, a petitioner must prove that his counsel was deficient and that deficiency prejudiced his trial. Strickland v. Washington, 466 U.S. 668, 691 (1984). Ineffective assistance claims during plea negotiations are governed by the two-part test set forth in Strickland. Hill v. Lockhart, 474 U.S. 52, 57 (1985). Although the Supreme Court has declined to "define the duties of defense counsel" during plea negotiations, Missouri v. Frye, 566 U.S. 134, 145 (2012), it cited favorably to using the ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2 (3d ed. 1999), as a guide. Frye, 566 U.S. at 145. Those standards require defense counsel to (a) keep the defendant appraised of plea negotiations; (b) advise the defendant on his or her options after an appropriate investigation; (c) conclude a plea negotiation only with the consent of the defendant; (d) tell the truth and not mislead the defendant; (e) explore the possibility of diversion; and (f) explain the possible collateral consequences of a plea. ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2. (3d ed. 1999).

Using this standard, the overwhelming proof at the evidentiary hearing is that Strianse was not deficient. Strianse communicated every offer by the Government to Wolcott and attempted to make further counteroffers, which Wolcott refused to allow. Strianse advised Wolcott on the effects of the 851 Information and what his options were all the way up to and during trial. Strianse never concluded the plea negotiations except when Wolcott so instructed. The Court cannot conclude that Strianse was constitutionally deficient.

Further, Strianse did not need a competency examination to fully understand Wolcott's memory issues. The uncontroverted proof from the evidentiary hearing shows that Strianse was well-aware of Wolcott's memory issues, receiving some of Wolcott's medical records from both Hodde and McNalley, and took measures to get him medication while at the jail. Strianse could tell when Wolcott had good days and bad days, and felt that he could communicate effectively with Wolcott. Strianse included Wolcott's memory issues in a motion to release Wolcott pending trial and ensured that the Probation Office included them in the Presentence Report. Importantly, there is no allegation that Wolcott was not competent to stand trial. Instead, the only reason Strianse would have requested a mental competency examination would be to understand Wolcott's memory issues. Strianse grasped Wolcott's memory issues without a competency examination, so he cannot be deficient for failing to request one.

Last, assuming that the Court accepted Mundy's standard for when trial counsel is effective, which has not been accepted by any other court nor this Court, Strianse would still not be deficient.[3] The proof at the evidentiary hearing shows that Strianse used the "collaborative method" when discussing the case with Wolcott, filling multiple notepads with information Wolcott gave him regarding each person expected to testify at trial. There is no evidence that Wolcott could not assist in his own defense or that Strianse ceded all authority to Wolcott without offering any guidance. Further, the record is void of any evidence that Strianse failed to explain anything clearly, or evidence that Wolcott could not understand anything Strianse explained. There is insufficient evidence that Strianse was deficient.

Even if Strianse was deficient, any deficiency did not cause Wolcott prejudice. To prove prejudice, Wolcott must show that "the outcome of the plea process would have been different

---

[3] As the Court noted at the evidentiary hearing, Mundy cited himself in his Report when discussing the constitutional standard for a trial attorney, rather than any Sixth Circuit or Supreme Court case. (Doc. No. 64 at 111.)

with competent advice." Lafler v. Cooper, 566 U.S. 156, 163 (2012). There was no evidence that Wolcott would have accepted an eight year plea deal had Strianse explained it any differently unless the Government was willing to return all of his property, which was not offered. As such, Wolcott did not prove prejudice.

Wolcott's ineffective assistance of counsel during plea negotiations claim is denied.

B. REMAINING CLAIMS

Wolcott's first two claims involve the enhancement of his mandatory minimum penalty based on the Government's filing of the 851 Information. First, Wolcott argues that his Sixth Amendment rights were violated when the Court determined the fact of his prior conviction rather than the jury. (Doc. No. 2 at 10.) It is true that the Supreme Court recently held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." Alleyne v. United States, 133 S.Ct 2151, 2155 (2013). However, the Supreme Court explicitly held Alleyne did not apply to the "narrow exception . . . for the fact of a prior conviction." Id. at 2160 n.1. Instead, when a prior conviction increases a mandatory minimum, it is a "sentencing factor" for the Court to decide rather than an "element" for the jury. Alamendarez-Torres v. United States, 523 U.S. 224, 234 (1998). Accordingly, the Court rejects this argument.

Wolcott concedes that his second ground for relief should be denied. Specifically, he states in his reply brief that the "government is correct that the prior conviction of Wolcott is a qualifying predicate for the 21 U.S.C. § 851 enhancement." (Doc. No. 18 at 6.) He argues, however, that if the prior offense had to be presented to the jury, trial counsel "may have investigated the issue and properly advise[ ] Wolcott when the decision was being made as to the disposition of the case and

how to proceed." (Id.) That argument goes to the ineffective assistance of counsel claim in, which the Court denied above.

Wolcott's fourth claim is that his trial counsel prevented him from testifying at trial, and his appellate counsel was ineffective in failing to raise the issue on direct appeal. (Doc. No. 2 at 21-22.) Judge Haynes previously addressed this issue, denying an evidentiary hearing because the claim lacked merit. (Doc. No. 22 at 3-4.) The Court incorporates Judge Haynes' reasoning here. Specifically, a "defendant is presumed to have waived his right to testify unless the record contains evidence indicating otherwise." Hodge v. Haeberlin, 579 F.3d 627, 639 (6th Cir. 2009) (citing United States v. Webber, 208 F.3d 545, 551 (6th Cir. 2000)). Wolcott concedes that the record is silent as to whether he freely and voluntarily waived his right to testify (Doc. No. 22 at 4 (citing Doc. No. 2 at 23)). Accordingly, the Court must presume Wolcott waived his right to testify. Counsel was not deficient, Strickland, 466 U.S. at 688, and therefore this claim is denied.

C. CERTIFICATE OF APPEALABILITY

The Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11 of the Rules Governing Section 2255 Cases in the United States District Courts. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). Wolcott has not satisfied this standard, and thus a certificate of appealability is denied.

III. CONCLUSION

For the foregoing reasons, the Petition (Doc. No. 1) is denied. A certificate of appealability is denied.

The Court will issue an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE